and J.P. Morgan Chase Bank, N.A. Our next case this morning is Taylor v. J.P. Morgan Chase, and Mr. Gerard, if you would please come forward. All right, you may proceed. Good morning. Bradley Gerard, appointed counsel for Mr. Taylor. May it please the Court, I'd like to start with the contract claim and then turn to the fraud and IAED claim. Black letter contract principles answer the central question whether Chase made an offer to Mr. Taylor. On that score, my argument begins at page 28A of the appendix. The standard for whether there was an offer is whether a reasonable person, viewing everything in the context, would view what was sent as an offer. And the answer here is plainly yes. Page 28A, the word offer is used three times. Indeed, in capital bolded letters, it says, let us know that you accept this offer. It tells Mr. Taylor that if he qualifies and he complies with the terms of the trial period plan, we will modify your mortgage in no uncertain terms. On the next page, it uses the term offer twice, also explaining what it is that he has to do, quote, to accept this offer. The following page, it says, once we are able to confirm your income and eligibility for the program, we will finalize your modified loan terms. So at that point, Mr. Taylor, as any reasonable person would, understood that he was getting an offer from Chase Bank. If he sent in a trial period payment and the materials that Chase requested, then Chase would be bound to enroll him in a trial period. So at that point, there is a contract. Now, the next question then is, once there's a contract, if Mr. Taylor upheld his end of the bargain, did Chase breach by not upholding its end of the bargain? And Mr. Taylor certainly did. I'd like to remind the court that at this stage of the litigation, you have to accept all of the facts as true as pleaded by Mr. Taylor. And so Mr. Taylor alleged that he was qualified, that he remained qualified, that he sent in all of the payments. Not only did he allege those things, he actually attached them all to the documents in the district court. So all of that is in the record. He showed that he was qualified. Counsel, you're leaving out the step in the process that requires the lender's signature and the return of a fully executed copy to the borrower. So three responses to that, Your Honor. First, again, read in context, the question has to be, what would a reasonable view, a reader, understand that to mean? And as explained in our brief, the sentence preceding the sentence that Chase relies on explains that this is just a method of communication. What it says is, if you do qualify, we will send this back. And if you don't, we will send you something that says you're not qualified. Not as in a kind of absolute escape route for Chase to just not send it back whenever it sees fit, allowing it to continue to take the payment to induce Mr. Taylor to think that he had part of this agreement. Second, you have to interpret any ambiguities against the drafter of the document. So to the extent that it is ambiguous at all, which we don't think it is, it still has to be interpreted against Chase and in favor of Mr. Taylor. And then finally, even if it were viewed in favor of Chase, which it can't be at this point in the litigation, and because Chase was the drafter, but even if that were the case, Chase itself told Mr. Taylor that it didn't rely on that. And Mr. Taylor was very active. He followed up. He did everything that he was supposed to do. He called Chase a number of times, and he spoke to his supervisor named Chris Montgomery and said, hey, I'm just told by Chase, don't worry, I don't know of a single instance in which we've ever signed these and sent those back. So even viewing that as some kind of requirement, some kind of condition that Chase had that it could use to get out of being in a contract at all, Chase waived that condition by telling Mr. Taylor that it simply doesn't do that. And of course, Mr. Taylor reasonably then continued to send in payments, as any reasonable person would. I understand your argument to be that if that was a condition of the contract, it was waived by both Montgomery's statement and or the conduct of accepting the reduced payments over a period of time. Is that right? Yes, Your Honor. Now, were the TPP payments, there were three of them, if I recall correctly, what happened after that? What does the record tell us about payment levels? The record doesn't tell us anything about what happened after that. I mean, it does tell us that Mr. Taylor contacted Chase and said, hey, I've upheld my end of the bargain, I've paid the three payments, and I was told that after I paid the three payments, my loan would be permanently modified. I've upheld my end of the bargain, now it's time for you to uphold your end of the bargain. But after that, in terms of the payments, we don't have anything in the record. Mr. Taylor just included in his documents and his pleadings that he had satisfied the trial period plan. So he included the three payments, but nothing beyond that. What do you think the status of the TPP was between the last payment on December 1st, 2009, and the letter in May of 2010 that says we don't think you qualify? Well, I think at that point, Chase had an obligation, a contractual obligation, to permanently modify his loan so long as he remained qualified, which he did, and that's something that he did at that point, and this is exactly why he got it at that point. Once there's an agreement, once there's a contractual obligation, and once the plaintiff, once the homeowner has satisfied his or her end of the bargain, then at that point, the bank is obligated to offer a permanent modification. Now, in Chase's briefs, I think Chase conflates what Mr. Taylor is saying, that from the get-go, Mr. Taylor was owed a permanent modification. That's just not the case. That's not what he's ever alleged, and that's definitely not what we're arguing here. The agreement was that if Mr. Taylor satisfied certain conditions, then Chase would do that, and that was the agreement, and he upheld his end of the bargain. Mr. Gerard, can you address Wygod a bit? And in Wygod, as I read it, it seemed quite significant to the court that Wells Fargo there had returned, I think it was a HAMP document, right? Yes. And there was an argument about whether there needed to be a fully executed version of the modification agreement as well, but it sure seems to me that the court in Wygod attached significance to the lender's return of the HAMP document. Is that not right? No, that's correct, Your Honor, but we think that the signed TPP in Wygod was sufficient to show that there was a contract, but it wasn't necessary, and that's how the Ninth Circuit viewed Wygod in Corvello and how the Eighth Circuit viewed it in Topchan. They said, that's not really what the case turned on. Now, of course, that was enough in Wygod to show that Wells Fargo had made an agreement. It made that step of Wygod easy. It made that step of Wygod easy, exactly. The heavier lifting was in later stages. Right, but if the court were to treat step one of the TPP any differently than step two, then it wouldn't make sense because step two of Wygod said, look, at this point, you still didn't sign it and send it back, but we can't read this to give the bank such unbridled discretion to kind of do whatever it wants, and it wouldn't make any sense to import something totally different into step one. So it was an easy answer of step one in Wygod, but we don't think that that makes any significant difference here. So unless there's any further questions about the contract, the formation of the contract, I can go to the breach, which, as I mentioned before, Mr. Taylor alleged that he was qualified. He alleged that he made his three payments, and he alleged that he remained qualified. At that point, Chase had an obligation to offer him a permanent modification. It's that simple, and I think that once it is concluded that there is a contract here, then the answer of whether it was breached was simple. Chase simply did not offer him the permanent modification that it was obligated to under the contract and, I might add, as highlighted in Wygod, under the federal program. This isn't a federal program that gave Chase discretion to decide whether or not it wanted to offer people modifications. As a condition of the receipt of the taxpayer funds, the $25 billion in taxpayer funds, Chase had an obligation to offer the modifications to anybody who was qualified and remained qualified. Now, I'll turn quickly just to promissory estoppel. I think that Wygod answers the promissory estoppel almost squarely. I do want to highlight one thing, though, is that Garwood, this court's case interpreting Indiana promissory estoppel law, did highlight that Indiana is possibly the loosest of the states in terms of promissory estoppel. It has the kind of broadest promissory estoppel doctrine. So we think with that, especially on top of Wygod, that's enough. But if there was such a promise, there was also a condition that was not satisfied here. I think that if there was a promise, there was a condition. I agree. And a conditional promise can count for promissory estoppel. The condition was that Mr. Taylor satisfy his end of the bargain, which is exactly what he did. So I think that the condition as it existed was satisfied. On the contract theory, before you move on, what's Mr. Taylor's theory for his damages? How was he, what did he do differently, or what would he have done differently if, in his view, the bank hadn't strung him along for so long? Well, he would have had a modified mortgage. So his mortgage payments that he owed would be significantly lower. So the damages will be the difference between what he ended up owing and what he should have owed under the permanent modification. Do we have any sense, apparently there was a later modification, at least the bank is telling us that. I don't know where it fits into the pleadings, but how does that compare with what a HAMP modification should have produced? Well, we don't know because it's not in the record. Chase's reference is to it, Chase makes reference to it, but there's nothing in the record that shows any information about it. So that would be a question of fact that could be dealt with on remand. Now I'd like to turn to the fraud and the IIED claims. Beginning with the fraud claim, I'd like to say that Mr. Taylor, especially as a pro se litigant, pleaded that Chase made false representations, that they were knowingly false, and the way that they were knowingly false was that they were promises of future conduct that the bank at the time knew it wasn't going to uphold, and that's sufficient for a fraud claim. That's a pretty rare kind of fraud claim in Indiana law, however. It is a rare fraud claim, but at this stage, at the pleading stage, Mr. Taylor has sufficiently alleged it. He alleged that Chase knew that it had no intention of modifying the mortgage, that it had no intention of upholding its end of the bargain, yet it strung him along anyway, and it did so to his detriment. That's sufficient, again, at this stage, at the pleading stage, for there to be a fraud claim. Now, I do want to just make two quick notes. At pages 78 through 80 of the appendix, Mr. Taylor alleged all of the facts that constitute a fraud claim. Now, as a pro se litigant, he wasn't required to put those allegations under the heading of fraud. That's something that this court has held going back to 1992, that it's not what claims that you outlined, but it is the facts and if they can support any theory of recovery. If we were to find the weight of Indiana authority, rejected promissory fraud as a common law fraud theory, and focused so that he would need to show a false representation of a present or past fact, is any such misrepresentation alleged here? I don't think there's any misrepresentation of a past fact that would be sufficient for this case, because I think the argument is that it was the future promise. So he hasn't argued that, but I also do want to say that he incorporated in his fraud claim, the fraud claim that the district court addressed, he incorporated all of his previous allegations of the second complaint, of the amended complaint, and that right there is sufficient for it to be on the district court's radar that he was alleging a common law fraud, and it should have been addressed, but it wasn't. And at page 12 to 13 of his subjection to the magistrate judge's report and recommendation, he basically says as much, he says, it's not about the legal claim, it's about the facts that support it, I've pleaded facts that show that I've been injured, and the court should consider it, but the district court did not consider that. And then finally, I want to turn to the IAED claim. Now, in Indiana IAED, the Indiana courts have ruled that just failure to modify a loan isn't sufficient for an IAED claim, but I want to make clear that that's not what Mr. Taylor is alleging. Mr. Taylor is alleging that Chase strung him along, intended to not modify his mortgage, but then after that, for five years, it left him hanging in the balance under a standing order of foreclosure, it twice scheduled his home for sheriff sales, and he alleged on pages 81A all of the harms that the IAED caused, severe anxiety and stress, marital strife, embarrassment, feelings of inadequacy, and that's for five years. Again, this is a very fact-intensive claim, and it's something the district court should deal with on remand. If there's no further questions, I'd like to save the reminder of my time for rebuttal. Thank you. Thank you. Ms. Wheaton. Good morning. Still? Jill Wheaton for the defendant appellate, JPMorgan Chase Bank. The district court did not err in either dismissing the breach of contract and promissory estoppel claims, or in denying leave to amend those and to add the tort claims for fraud and intentional infliction of emotional distress. Mr. Girard started by going right to the letter of 28A, 29A. Sure, I'll go there, too, because I like the language in it. It says at one point, if you accept this offer and see if you qualify. To accept this offer and see if you qualify. The offer was apply for permanent modification. HANF gave banks a couple options. One of the options was what the bank world calls Option B. Option B is you talk to someone over the phone. You see if they might qualify. You send a letter for a trial plan, the word trial is significant. While the trial plan is in place, you look at documentation you get from that person to see if they truly do qualify for a loan mod. Then you either give it to them or you don't. Here, the trial plan was, here's an offer for you to apply for this modification. Do you agree, Ms. Wheaton, that the qualification is an objective evaluation? There are certain standards by which, if I remember, is your payment a certain amount of your income? Objective financial criteria. Exactly. And you've got to make the payments, right? Correct. You do. Right. And he did. He did. So the bank was not reserving, or do you think it was, discretion to decide whether to offer the permanent modification? No, not under HANF. Under HANF, there were certain criteria and it was, yeah, it was a follow of the rules. Now, you asked an interesting question to Mr. Girard that he couldn't answer, which was what happened after the three months. So what do you think? It's not in the record. He didn't pay. And guess what? He didn't pay for the next five years. And he got him a convocation for a few months. Guess what? He hasn't paid in years. Okay. And none of this is in the record, right? None of this is in the record, but it would be if we get to remand. But what is in the record, because it was raised as an affirmative defense, it was admitted to by Mr. Taylor in response to a discovery request, was that he did ultimately get a modification. And that modification also included a credit toward his account for what it would have been had he gotten it earlier. So this is all interesting and a great academic exercise for the law clinic, but it's kind of all a lot of much ado about nothing. Well, you may see it that way, but the way the issue is framed for us and the way you chose to move for a 12B6 dismissal frames it that way for us. I get that. So we need to address it that way. I get that. But even then, you can affirm the dismissal. You can affirm the dismissal for the reasons we just discussed. But there is not a cognizable contract. What the letter said was, we will consider you. Chase considered him. Chase determined at that time that he was not qualified under HAMP and denied and sent him a letter. So the comparison to these cases, Topsham, Corvello. So I thought the assumption, though, was that we have to operate on is that Chase was wrong about that, that he did, in fact, qualify. That is the allegation. It's an objective criteria. It would be subject to proof. Correct. Right? Yes. So I thought your principle, the principle point you were relying upon was, well, we never returned, we never qualified or satisfied this in less than until language. We never sent a countersigned version. I guess my question is how we could decide in the two levels, but assume that that is, in fact, a non-ambiguous requirement given the document as a whole. We still have the waiver arguments based on Montgomery's statement and based on the bank's conduct. So how do we decide those in your favor on the pleadings? Again, you look at the language of the contract. No, we've got the language of the offer, but then we have Montgomery saying, I don't know that we've ever done that. Correct. Right? Correct. And we have the bank continuing to accept the reduced payments over a period of months and an eight, nine-month delay in ultimately saying, oh, we don't think you qualify. Correct. Right. No, I get that. And if what we go back on is a breach of contract and we can file motions, then so be it. I can live with that. What I certainly don't want to go back on is a promissory estoppel claim, a fraud claim, and an intentional infliction claim because I think that's frankly just piling on. Judge Sykes made clear or pointed out the point for me that the promissory estoppel certainly was not an enforceable, cognizable promise. There was no reasonable reliance given all the qualifiers in there. He can't show any damages as a result, certainly not. And then in terms of the fraud and the intentional infliction claims, counsel completely ignored the Jaffray case, which is a published case out of the Indiana Court of Appeals that involved very similar facts, an alleged denial to grant a HAMP modification and said exactly what Mr. Girard said. They never intended for me to do this. They were stringing me along. And what Jaffray Court said was that certainly doesn't come anywhere close to the kind of beyond the pale outrageous conduct that's required by an intentional infliction claim. What I should have gone back to, Your Honor, and I'm remembering now, is that I still think the claims are also barred by statute of limitations, which is an argument we raised below. And you noticed the reply points concerning, let's see, you noticed them and I don't remember off the top of my head what they were, but they were addressed in the reply brief. Right. And those questions may actually be considerably more nuanced than your brief suggests. I don't know how we decide those in the first instance here. I get that. I get that. But, again, it's another defense that we have. And then also in terms of the tort claim, the plaintiff is trying now to really look at the whole Second Amendment complaint as a whole, look at all of it. The fraud claims that were actually alleged were very specific. They had to do with the violation of a consent decree. And the court properly found that he didn't have standing to make those arguments. It didn't have jurisdiction to enforce those arguments. So now they come up with these new claims that are basically based on, again, well, you never intended to give this to me. Again, fraud claims can't be based on representations about future conduct, which I think you pointed out for me. And he also didn't- I didn't do that for you. Okay. Well, thank you. Anyway, you can't get around it by simply just putting the fraud language in there and then just relying on it. But all things considered, we believe the district court did not err in dismissing. But should this case determine that their court determined that there was enough there to state a claim for breach of contract, we would ask that they remanded solely on that claim and that we could raise in the lower court things, again, like statute of limitations, reliance, or not reliance, but being barred by prior release and settlement agreement in this case based on second modification. Anything else for me? You think you've got a, did you get a release? That's what I need to speak with. That I don't know. It was determined a little farther into the appellate briefing game that missed, exactly. These things happen. You know that, that Mr. Taylor- It feels like we're doing a pretrial conference in the district court. It was determined a little bit later that, you know, part of that modification was because he opted out of a class action. So we need to delve a little further deeper into that. But I don't expect you guys to look at that now. Thank you. Thank you. Mr. Girard, your time is almost up. I just have two very quick points, one on the fraud and one on IAED. For IAED, Jaffrey was the case I was speaking about that was intentional mishandling, and as we explained in our brief, especially our reply brief, that is not what Mr. Taylor was talking about. And fraud, it's not just look to anything in the first amendment complaint on page 82A under the heading fraud. It incorporates all of the other allegations. If there's no further questions, we ask this court to reverse and remand for proceedings on the merits. Thank you. Thank you. Thanks to both counsel. The case is taken under advisement, and we thank the clinic and all counsel for the clinic for your willingness to accept this appointment for the plaintiff and for your fine advocacy and assistance to the court. Thank you.